UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LIZA GOLD,

               Plaintiff,

      v.

CALIFORNIA HIGHWAY PATROL, et al.,

               Defendants.

Case No.  23-cv-03414-RFL

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 52

Two California Highway Patrol ("CHP") officers were investigating a hit-and-run accident involving property damage to a parked car.  Officer Cho found the suspect, Ari Gold, hiding in a bathroom in his grandmother's house.  According to Gold, he had a gun with the barrel pointed at the floor when Officer Cho found him sitting in the bathroom.  He testified that, as soon as he saw Officer Cho, he tossed the gun away, and then the officers opened fire while he was unarmed.  Officer Weaver could not see into the bathroom but fired his gun from another room based on what he inferred to be the danger to Officer Cho.  Forty-four shots were fired, none of which were from Gold's gun.  Gold's gun was found on the ground outside the bathroom, consistent with his account of having tossed it away.  Gold's gunshot wounds left him quadriplegic, and he passed away three-and-a-half years later.

Gold's mother and successor in interest, Liza Gold ("Plaintiff"), brought this suit against CHP and the officers involved in the investigation, Officers Kristi Cho and Christopher Weaver ("Defendants").  Plaintiff alleges that Officers Cho and Weaver deployed excessive force in violation of the Fourth Amendment and violated Gold's Fourteenth Amendment substantive due process rights.  Plaintiff also asserts various state law claims, including a negligence claim on the

basis that Officers Cho and Weaver made a series of basic errors due to their inexperience with searching residences.  Plaintiff's expert criticizes Officers Cho and Weaver for failing to set up a perimeter, wait for backup, or use a loudspeaker to call for Gold to surrender from outside the house.  Plaintiff further contends that CHP negligently supervised Officers Cho and Weaver throughout the course of the investigation, principally by assigning them a supervisor who was outside cell phone range during most of the shift.

For the reasons set forth below, Defendants' motion for summary judgment is **DENIED** as to Plaintiff's excessive force, assault and battery, Bane Act, and intentional infliction of emotional distress claims against Officer Cho, and **GRANTED** as to those claims against Officer Weaver.  Defendants' motion for summary judgment is **DENIED** as to Plaintiff's survival action for negligence and negligent supervision against all Defendants, and **GRANTED** as to the Fourteenth Amendment and wrongful death claims against all Defendants.

## I.    BACKGROUND

### A.    Factual History

Before his death, Ari Gold was criminally prosecuted for assault and brandishing a weapon at a peace officer, as further detailed in the procedural history section below.  At that trial, Gold testified that on July 23, 2019, he had smoked methamphetamine at an apartment with friends and had an unusually bad reaction, leading him to believe that something was trying to kill him and his family.  (MSJ Ex. D at 1915–16.)[1]  In his frenzy, Gold ran out of his friend's apartment, stole a truck, ran a stop sign and hit a parked car, and drove to the home of his grandmother.  (*Id.* at 1917, 1922, 1923.)  Upon entering the home, Gold grabbed a gun and walked to the master bathroom, which consists of a jacuzzi suite and a smaller bathroom with a shower and toilet.  (*Id.* at 1927, 1932.)

---

[1] The exhibits submitted with Defendants' motion for summary judgment shall be referred to by "MSJ Ex." and their corresponding exhibit letter as assigned in Docket Number 52.  The exhibits submitted with Plaintiff's Opposition to the Motion for Summary Judgment shall be referred to as "Opp. Ex." and their corresponding exhibit number as assigned in Docket Number 54.  Page numbers reflect the original internally paginated numbers.

Officers Cho and Weaver were unaware of this sequence of events when they responded to a witness report of the hit-and-run involving Gold.  (MSJ Ex. A at 29.)  Witnesses reported that they saw Gold running toward a home, but could not be sure whether he entered the home or ran out onto the adjacent highway.  (*Id.* at 53, 56.)  Officers Cho and Weaver were not aware that the home in question was Gold's grandmother's home.  Because the officer in charge, who was the designated supervisor for Officers Weaver's shift, had been assigned to patrol in Big Sur where service and radio were unreliable, Officer Weaver decided to call Sergeant Chris Pia, an off-duty officer, for advice on next steps.  (Opp. Ex. 1a at 1240.)  Sergeant Pia told him he needed to clear the house and asked him to call for backup units.  (MSJ Ex. A at 56.)  Officer Weaver did so but was told that no backup was immediately available and that the K-9 unit had been dispatched to a different city.  (*Id.* at 56, 60.)  Neither Officer Weaver nor Officer Cho had ever cleared a house before.  (Opp. Ex. 1 at 55.)

Gold's grandmother arrived in her car, and Officer Weaver ended his call with Sergeant Pia, promising to call back.  (MSJ Ex. A at 60.)  Officers Cho and Weaver informed her that a suspect may have run into her house and asked whether she wanted them to clear the home for her, to which she responded "yes."  (*Id.* at 59–60; Opp. Ex. 25.)  The officers entered the home, announcing "CHP coming in," and cleared each room until they encountered a locked door.  (MSJ Ex. A at 42–43.)  The officer went back outside and asked Gold's grandmother about the locked door.  She responded that her son lived at the home but no one should be there at the moment.  (*Id.* at 33.)  In fact, Gold occasionally stayed with her, though he was not allowed to be there without her permission.  (MSJ Ex. D at 1939.)  Officers Cho and Weaver did not ask Gold's grandmother the questions that would have revealed this information, and therefore continued to remain unaware of Gold's relationship to the home.

Officers Cho and Weaver then re-entered the home and returned to the locked door.  Officer Weaver used a card to open the door.  (MSJ Ex. A at 44–46.)  The officers drew their weapons when they entered the main bedroom.  (*Id.* at 48.)  Officer Cho walked to her left toward the smaller bathroom located within the room with the jacuzzi tub, while Officer Weaver

walked to the right of the jacuzzi tub room into the adjacent bedroom. (*Id.* at 50.) The door to the bathroom was partially open. (Opp. Ex. 1 at 110.) Officer Cho entered and then visually scanned the room. (Opp. Ex. 2 at 37.) What happened next is disputed.

*Gold's version.* Gold testified that at the time of Officer Cho's entry, he was sitting on the toilet and holding the gun with the barrel pointed at the ground. (MSJ Ex. D at 1933.) While in the home, Gold did not hear anyone come inside or announce themselves. Nor did he see or hear the officers enter the jacuzzi suite. (*Id.* at 1934.) Gold testified that while sitting on the toilet, he saw a female officer in uniform appear in the doorway with her gun pointed towards the floor. (*Id.*) Gold doesn't remember hearing any commands, but remembers that he "tossed" the gun "out the door" when he saw Officer Cho. (*Id.* at 1934–35.) Then, once the gunfire started, Gold stood up and then was shot once in the lower back and then once in the shoulder area. (*Id.*) He then fell to the floor, unable to move and eventually losing his consciousness. (*Id.* at 1936.)

*Officer Cho's version.* Officer Cho testified that she found Gold sitting on the ledge in the shower when she opened the shower curtain inside the bathroom. (MSJ Ex. B at 52.) Her testimony conflicts with Officer Weaver's testimony on this point, as Officer Weaver testified that he never saw Officer Cho leave the threshold of the bathroom door. (Opp. Ex. 1 at 110; Opp. Ex. 6a, 6b.) Upon seeing Gold, Officer Cho testified that she raised her firearm, pointed it at Gold, and began giving commands for Gold to put his hands up. (*Id.* at 57, 62.) Officer Cho testified that Gold initially put both hands up, neither of which held a weapon. (*Id.*) She then observed that Gold started looking frantic and commanded Gold to "get on the ground", but he refused to comply. (*Id.* at 66–67.) Officer Cho then saw Gold's right hand reach down into an area behind the shower curtain that she couldn't see and pull out a gun, which Gold quickly pointed toward Officer Cho's chest. (*Id.* at 71–72.) As Officer Cho fired, she retreated to move out of Gold's sight, tripping on the ground outside the bathroom and continuing to shoot. (*Id.* at 97.) None of her 16 shots were later found to have hit Gold. (Opp. Ex. 2 at 74.)

*Officer Weaver's version.* Officer Weaver heard Officer Cho giving escalating commands directed at someone in the bathroom, and then saw Officer Cho back out of the

4

bathroom and heard a shot shatter a mirror close to his head. (MSJ Ex. A at 122–23.) Based on that, Officer Weaver believed that someone inside the bathroom was shooting at them through the wall. (*Id.* at 126–27.) Officer Weaver then started firing shots into the bathroom wall, without being able to see who was in there. (*Id.* at 136–37.) After observing that Officer Cho had run out of bullets and had fallen to the ground, Officer Weaver yelled at her to reload. (*Id.* at 146.) Officer Weaver then claims that he saw Gold dart out of the bathroom and back in, and then fired three or four more shots into another wall adjacent to the bathroom. (*Id.* at 150.) Officer Cho's testimony conflicts with Officer Weaver's on that point, as Officer Cho testified that she did not see Gold dart out of the bathroom. (Opp. Ex. 2 at 100.) After firing those additional shots, Officer Weaver heard no sound and stopped shooting. (MSJ Ex. A at 153.) Officer Weaver testified that the entire incident, from Officer Cho entering the bathroom to seeing Gold injured on the ground, took seconds. (*Id.* at 143–44.) Officer Weaver was later found to have fired 29 shots in total. (Opp. Ex. 1 at 139.)

Officer Weaver found Gold's gun lying on the floor outside the bathroom containing the toilet and shower. (MSJ Ex. A at 174–75; Opp. Ex. 7d.) No shots were found to have been fired from that gun. (*Id.* at 153–55.) Gold was rendered quadriplegic from the impact of the bullets. (*Id.* at 150.)

## B.    Procedural History

Ari Gold filed a tort claim with the State of California on January 17, 2020, alleging excessive force. (Opp. Ex. 12.) The claim was denied (Opp. Ex. 13) and the District Attorney of Monterey County filed a criminal action against him. Gold filed a civil lawsuit on March 13, 2020, which was stayed while the criminal action proceeded to trial. Two-and-a-half years later, Gold was convicted of assault and brandishing a weapon at a peace officer. On January 10, 2023, while the appeal of his conviction was still pending, Gold passed away. (MSJ Ex. C at 16.) On March 2, 2023, the Court of Appeal abated the cause and dismissed the appeal. (Opp. Ex. 14.) This civil action was re-filed by Plaintiff on August 11, 2023.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.[2]

Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.    DISCUSSION

### A.    The *Heck* Bar

The *Heck* doctrine does not bar Plaintiff's claims. In *Heck v. Humphrey*, the Supreme Court held that "when a state prisoner seeks damages in a Section 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." 512 U.S. 477, 487 (1994). Under California law, because Ari Gold's state cause of action was abated, his conviction no longer stands, and the presumption of innocence has now been restored. *See*

---

[2] Evidence may be presented in a form that is not admissible at trial so long as it could ultimately be capable of being put in admissible form. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"); *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004) ("Even the declarations that do contain hearsay are admissible for summary judgment purposes because they 'could be presented in an admissible form at trial'").

*People v. Mount*, 66 Cal. App. 5th 599, 605–06 (2021). Defendants conceded at oral argument that *Heck* is not a bar to Plaintiff's Section 1983 claims under these circumstances.

**B.    Fourth Amendment Excessive Force Claim**

    **1.    Officer Cho**

        **a.    Constitutional violation**

Ari Gold's account of what transpired in the bathroom is diametrically opposed to Officer Cho's, setting up a genuine dispute of material fact as to whether Officer Cho used excessive force when she opened fire in the bathroom. An excessive force claim against a police officer is considered a seizure and analyzed under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Courts analyze reasonableness from the perspective of a reasonable officer on the scene and employ a totality-of-the-circumstances test using the then-existing facts and circumstances. *Id.* at 396–397. The "'most important' factor under *Graham* is whether the suspect posed an 'immediate threat to the safety of the officers or others.'" *Est. of Lopez by & through Lopez v. Gelhaus*, 871 F.3d 998, 1005 (9th Cir. 2017). The other factors examined by *Graham* include the severity of the crime at issue and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396.

Here, if the jury were to credit Ari Gold's account over Officer Cho's, the jury could reasonably conclude that Officer Cho used excessive force. Defendants first contend that Officer Cho reasonably feared for her life when Gold allegedly ignored her commands to get on the floor, grabbed a gun from behind the shower curtain, and pointed it at her chest. But Gold testified to a different set of facts, and inferences must be drawn in Plaintiff's favor at the summary judgment stage. *See Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) ("[I]n the deadly force context, we cannot simply accept what may be a self-serving account by the police officer." (internal quotation marks omitted)). Gold testified that he was sitting on the toilet and holding a gun with the barrel pointed toward the floor when Officer Cho entered the bathroom doorway, and that as soon as he saw her, he "tossed the gun away from [him] out the

door." (MSJ Ex. D at 1934–35.) He testified that "[he] wanted to get [the gun] away from [him]," and that "[i]t went somewhere behind her." (*Id.*) Nor is Gold's version of the events without evidentiary support, as his gun was later found on the floor outside the bathroom. (MSJ Ex. A at 174–75; Opp. Ex. 7d.)[3] Thus, Plaintiff has created a genuine dispute of fact as to whether Gold actually ignored Officer Cho's commands and pointed his gun at her chest.

Defendants next argue that that even accepting as true Gold's version of events, Officer Cho reasonably interpreted Gold's tossing of the gun as a "harrowing gesture." *See George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). But the evidence does not require the jury to draw that inference. "Toss[ing]" an object away is not inherently a threatening gesture, and there is no indication that Gold aimed the gun at Officer Cho or threw it with unusual force. Moreover, Gold testified that the sequence of events was that (1) he was sitting in the bathroom, (2) he tossed away the gun upon seeing Officer Cho, (3) after he had surrendered the gun, the officers opened fire, (4) he stood up only after the gunfire started, and (5) he suffered his first gunshot wound after he stood up. (MSJ Ex. D at 1933–35.) Taking Gold's testimony as true, a jury could reasonably infer that Gold tossed away the gun while seated, and that he was shot after he had surrendered the weapon. Having drawn that inference, a reasonable jury could find that a reasonable officer would not find the tossing away of the gun from a seated position to be a harrowing gesture indicating a deadly threat to the officer's safety, particularly when the barrel was already pointed at the floor, and in any event, that Gold no longer posed a deadly threat after tossing away the gun.

If conflicts between Gold's testimony and Officer Cho's are resolved in Plaintiff's favor, and all inferences are drawn in Plaintiff's favor, a reasonable jury could further find that the other *Graham* factors support a finding of excessive force. At the time of the confrontation, Officers Weaver and Cho were unaware that Gold was high on methamphetamine or that he had

---

[3] On the other hand, Officer Cho's testimony that she opened the shower curtain *inside* the bathroom to discover Gold (MSJ Ex. B at 52) is contradicted by Officer Weaver's recollection that she never left the threshold of the bathroom door. (Opp. Ex. 1 at 110; Opp. Ex. 6a, 6b.)

stolen a truck; they only knew that Gold may have been involved in a hit-and-run accident involving a parked car.  (MSJ Ex. A at 29.)  Thus, they had little reason to suspect that Gold was an unusually dangerous individual.  Moreover, it is disputed whether Gold was actively resisting arrest when Officer Cho decided to shoot, and whether Gold's actions at that point communicated a desire to surrender or an intent to evade arrest by flight.

**b.    Clearly established**

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.  When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011) (quotation and citation omitted).  Thus, "to overcome qualified immunity, Plaintiffs must show that [defendants] (1) 'violated a federal statutory or constitutional right' and (2) 'the unlawfulness of their conduct was clearly established at the time.'"  *Ballentine v. Tucker*, 28 F.4th 54, 61 (9th Cir. 2022) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)).

The law clearly establishes that shooting a suspect who is surrendering by tossing their gun from a seated position—which was pointed at the floor and not at the officer—is unreasonable under Fourth Amendment.  "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal brackets omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  While "a case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.*  In the Ninth Circuit, courts begin the clearly established inquiry by looking to binding precedent.  "If the right is clearly established by decisional authority of the Supreme

Court or this Circuit, [the] inquiry should come to an end." *Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir. 2004) (internal citation omitted).

    *Estate of Lopez by & through Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017), provides notice that Officer Cho's decision to shoot under these circumstances was unconstitutional.  In *Lopez*, the Court found that Officer Gelhaus acted unreasonably when he shot Andy Lopez, a teenager who appeared to be walking around with an AK-47 in his hand with the muzzle pointed toward the ground.  *Id.* at 1010–11.  As Lopez was walking down the street, Officer Gelhaus yelled at him from behind to "Drop the gun!"  *Id.* at 1002.  Officer Gelhaus contended that as Lopez turned around, his arm swung such that the barrel of his weapon came up and that Officer Gelhaus reasonably perceived this movement to be a threatening gesture necessitating deadly fire.  *Id.* at 1003.  The Court disagreed, holding that this "incidental movement alone would not compel a jury to conclude that [Officer] Gelhaus faced imminent danger given the starting position of the gun" and affirming the district court's denial of summary judgment.  *Id.* at 1008.  Similarly, if the jury credited Gold's testimony, the jury could reasonably find that Gold held the gun with the barrel pointed at the floor and tossed the gun away in a non-threatening manner.  *Lopez* clearly established that, under those circumstances, applying deadly force would be unreasonable.

### 2.    Officer Weaver

#### a.    Constitutional violation

    Even drawing factual inferences in favor of Plaintiff, no reasonable jury could conclude that Officer Weaver used excessive force when firing either his first round or second round of shots during the incident.

    The undisputed facts are that Officer Weaver started firing his first round of shots after hearing Officer Cho issue escalating commands, seeing her retreat backwards, and hearing a single gunshot that shattered a mirror on the wall close to his head.  (MSJ Ex. A at 122–23.)  This supports a reasonably mistaken conclusion that shots were being fired from the bathroom, and that immediate action was needed to protect Officer Cho and himself from danger.

During oral argument, Plaintiff argued that the shot that shattered the mirror next to Officer Weaver's head must have been fired by Officer Cho—since there is no evidence Gold fired any shots during the incident—and that Officer Weaver should have known this fact and refrained from firing.  But given the location of the shot that hit the mirror, which would have been inconsistent with Officer Cho firing toward the bathroom, Officer Weaver's mistake was reasonable.  Moreover, even if Officer Weaver should have known Officer Cho was the one who fired, the fact that Officer Cho was firing at all could reasonably have been construed by Officer Weaver to signify that a deadly threat was present in the bathroom, given the circumstances that preceded the firing.  Officer Weaver could have reasonably concluded from Officer Cho's escalating verbal commands that she had found someone hiding in the bathroom, and that the person was not complying with her commands.  Indeed, even Plaintiff's expert Sergeant Jack Friedman concedes that this might be a "defensible judgment decision" on Officer Weaver's part.  (Opp. Ex. 23 at 36.)

Plaintiff additionally contends that shooting through a wall, with no knowledge of what was behind it, constituted excessive force.  But, as detailed above, the undisputed facts establish a reasonable belief by Officer Weaver that someone in the bathroom posed a deadly threat to him and his partner.  Plaintiff identifies no authority for the proposition that the Fourth Amendment required Officer Weaver to put himself into danger by going to the bathroom doorway to see who was posing that threat before responding to it.

Officer Weaver's decision to fire a second round of shots, after both officers reloaded, was also reasonable given the circumstances.[4]  While it is reasonable to infer that the gunfire momentarily stopped after the first round of fire, as both Officers Cho and Weaver reloaded, it is still reasonable for Officer Weaver to assume that the threat had not yet abated and that additional force was necessary to defend himself and Officer Cho.  There is no indication that

---

[4] Officer Weaver testifies that Gold darted out of the bathroom after the first round of shots stopped.  (MSJ Ex. A at 150.)  This testimony is not credited in the analysis because it is contradicted by both Gold and Officer Cho, and inferences must be drawn in Plaintiff's favor.

Officer Cho ever communicated to Officer Weaver that the threat had been defused, or that Officer Weaver would reasonably be expected to have realized that for some other reason. Nor does the law require Officer Weaver to put himself in danger by pausing to investigate. *See Wilkinson v. Torres*, 610 F.3d 546, 552–53 (9th Cir. 2010) (requiring an officer to reevaluate whether a deadly threat has been eliminated after each shot places additional risk on the officer not required by the Constitution).

Plaintiff further asserts that the officers' pre-shooting tactics—*i.e.*, the failure to establish a perimeter, wait for backup, and call for surrender from outside home—should be taken into account in the excessive force inquiry. However, unlike California negligence law, the court's Fourth Amendment "totality of circumstances" analysis focuses on whether deadly force used in the moment was reasonable. *Biscotti v. Yuba City*, 636 F. App'x 419, 421–22 (9th Cir. 2016). Pre-shooting events leading up to the confrontation in the bathroom are pertinent only to the question whether a reasonable officer would perceive Gold's actions in the bathroom as a serious threat justifying the use of deadly force. Here, the alleged flaws in the tactical decisions about when and how to enter the house do not bear on that question.

### b. Clearly established

Furthermore, even if Plaintiff could show Officer Weaver's actions constituted excessive force, Plaintiff provides no case law on point clearly establishing that Officer Weaver's actions in either the first or second round of shots violated the Fourth Amendment. At oral argument, Plaintiff asserted that *Villanueva v. California*, 986 F.3d 1158 (9th Cir. 2021), and *Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010), provide the required notice that an officer in Officer Weaver's position was required to pause to assess the situation further after the first round of shots rather than reload and continue to respond with deadly force. The Court disagrees. In *Villanueva*, the court held that the officers used excessive force when, following a high-speed chase, they shot at a slow-moving vehicle that did not reasonably pose an imminent threat. 986 F.3d at 1170. But *Villanueva* does not apply to the facts at hand because it was possible for the officer to visually assess that there was no imminent threat, whereas here, the undisputed

evidence is that Officer Weaver could not see what was occurring within the bathroom, yet had plenty of circumstantial indicators that the bathroom continued to contain a deadly threat.

*Wilkinson* is inapposite for the same reason. Plaintiff pointed out that the officer in *Wilkinson*—who was found to have used reasonable force to subdue the driver of a stolen minivan—"did not shoot mindlessly, but responded to the situation by ceasing fire after he perceived that the van had lost power and that the threat had been eliminated." *Wilkinson*, 610 F.3d at 552. But this does not render Officer Weaver's conduct unreasonable, as the undisputed evidence is that he never perceived, for the reasons stated above, that the threat in the bathroom had abated.

Likewise, as to Officer Weaver's failure to set up a perimeter, wait for backup, or call for surrender using a loudspeaker from outside the home, Plaintiff fails to cite any governing law that clearly establishes that conduct as excessive force. *Torres v. City of Madera*, is not on point, as it focuses on the officer's actions immediately preceding the shooting, not tactics used well before the alleged threat precipitating the application of deadly force. 648 F.3d 1119 (9th Cir. 2011) (analyzing whether it was reasonable for an officer to take out their weapon before opening a police car door to apprehend a suspect who was already handcuffed in the back of the car). Nor are the factual circumstances in *Torres* sufficiently similar to the circumstances here, as Officers Weaver and Cho were preparing to confront a suspect at large as opposed to one who had already been restrained.

### C.    Fourteenth Amendment Due Process Claim

A substantive due process claim of impermissible interference with familial association arises when a state official harms a parent or child in a manner that shocks the conscience. *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). To establish a due process violation, a plaintiff must show that the officer acted with either "deliberate indifference" or "purpose to harm," depending on "whether the officer had the opportunity for actual deliberation." *Id.* at 1138–39 (9th Cir. 2008). At summary judgment, the appropriate standard may be determined as a matter of law if there is no genuine dispute over whether the officer had sufficient time to

deliberate.  *Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1165 (E.D. Cal. 2016).

Summary judgment is proper as to Officer Cho, as the purpose to harm standard applies here.  There is no factual dispute as to whether Officer Cho was taken by surprise when she saw Gold in the bathroom with a gun in his hand—Cho either saw the gun right as she entered the bathroom (per Gold's version of events) or after Gold suddenly pulled the gun out from behind the shower curtain (per Cho's version of events).  Further, there is no evidence that Cho harbored the purpose to harm Gold.

As for Officer Weaver, because the undisputed facts show that he did not act unreasonably during the incident, no reasonable jury could find that Officer Weaver exhibited "deliberate indifference" or a "purpose to harm," and summary judgment is proper.[5]

### D.    Compliance with California Claim-Presentation Requirements

An injured party may not maintain an action against a public entity unless a claim has been presented to the entity in accordance with the requirements specified in Cal. Gov. Code Sections 911.2 and 945.4.  While the parties agree that Ari Gold properly presented his claims to the State of California in January 2020, Defendants assert that Plaintiff Liza Gold's state law claims are barred because she did not independently present her claims and cannot rely on Ari Gold's prior presentation.  Plaintiff Liza Gold brings the negligence cause of action both as a wrongful death claim, based on her own loss of consortium and harms she suffered, and as a survival claim on behalf of the estate of Ari Gold, based on the harm he suffered.  Plaintiff's remaining state law claims are all brought as survival claims.  The Court addresses Plaintiff's wrongful death and survival claims in turn.

#### 1.    Wrongful death action

Plaintiff's wrongful death negligence action is barred.  *Lewis v. City & Cnty. of San*

---

[5] Plaintiff again argues that the officers' pre-shooting tactics should be considered in the Fourteenth Amendment inquiry, presumably to justify use of the "deliberate indifference" standard.  But Plaintiff fails to produce a case that supports this proposition.  *Porter v. Osborn*, 546 F.3d 1131 (9th Cir. 2008), is inapposite.  There, the court applied the "purpose to harm" standard despite the officers' use of questionable pre-shooting tactics—i.e., pepper-spraying the decedent and prematurely drawing their guns.  *Id.* at 1137–40.

*Francisco*, 21 Cal. App. 3d 339 (1971), is squarely on point.  In *Lewis*, the surviving husband and daughter of the decedent sought damages for the decedent's wrongful death.  *Id.* at 339.  The decedent had filed a government claim against the defendants for the injuries she sustained during her lifetime, but her heirs never filed a government claim for wrongful death damages. *Id.* at 340–41.  The court held that "[a]n action for wrongful death is wholly distinct from an action by the decedent, in his lifetime, for the injuries which ultimately cause his death," and therefore the decedent's "claim for damages for personal injuries cannot be deemed substantial compliance by her heirs with the claim statute[] so as to support this wrongful death action by them."  *Id.* at 341.

Moreover, Defendants are not estopped from asserting this argument.  Plaintiff argues that Defendants failed to raise the issue of claims presentation until it was too late for Plaintiff to present her claim.  But the procedural history demonstrates otherwise.  The claim accrued in March 2023 when the state criminal action was abated, giving Plaintiff until September 2023 to present her claims, or even March 2024 had she asked for leave to file a late claim.  Cal. Gov. Code §§ 911.2, 911.4(b).  Defendants answered in August 2023 asserting the government claims defense.  (Dkt. No. 16 at 4.)  Thus, contrary to Plaintiff's contentions, the government timely raised the issue.

Plaintiff further argues that claims presentation is not necessary when suing police officers in their personal capacity.  In particular, Plaintiff points to Government Code Section 950, which states: "Except as otherwise provided in this chapter, a claim need not be presented as a prerequisite to the maintenance of an action against a public employee . . . for injury resulting from an act or omission in the scope of his employment as a public employee."  That section, however, provides only that Plaintiff was not required to present her claims to Officers Cho and Weaver themselves.  However, the same chapter of the Code requires Plaintiff to present her claims to their employing public entity, CHP.  Section 950.2 provides that "a cause of action against a public employee . . . for injury resulting from an act or omission in the scope of his employment as a public employee is barred if an action against the employing public entity

for such injury is barred." And, in turn, an action against the public entity is barred if it has not been presented to the entity. Cal. Govt. Code §§ 911.2, 945.4. Accordingly, courts have uniformly held that a plaintiff suing individual public employees for conduct in the scope of their employment must first present those claims to the employing public entity. *See, e.g.*, *State of California v. Sup. Ct.*, 32 Cal. 4th 1234, 1243 (2004) ("As such, the language of the amended claim presentation statutes 'make[s] it clear that . . . a plaintiff must still allege in his complaint that he has complied with the claim statute in order to state a cause of action against a public employee.'").[6]

### 2. Survival action

By contrast, California courts have held that survival actions are not new actions, but rather continuations of the decedent's own actions. *Adams v. Superior Court*, 196 Cal. App. 4th 71, 79 (2011). Therefore, Plaintiff stands in Ari Gold's shoes, and has sufficiently presented her claims through Ari Gold's submission of his claim in January 2020. The cases relied upon by Defendants are not to the contrary, and indeed, confirm this conclusion. In both cases, neither the decedent nor their estate ever filed a government claim prior to the suit, so the survival action was barred and could not proceed based on their family member's presentation of a claim. *See Nelson v. County of Los Angeles*, 113 Cal. App. 4th 783 (2003) (finding suit barred where only decedent's mother had made a government claim in her personal capacity prior to the suit); *Mahach-Watkins v. Depee*, No. C 05-1143 SI, 2005 WL 1656887 (N.D. Cal. July 11, 2005) (finding suit barred where the heir's claims were not made in a representative capacity). Those cases reinforce the conclusion that, in a survival action, it is the decedent (or their estate) that must present the claim to the government, which Ari Gold did in this case.

---

[6] Plaintiff suggested for the first time at oral argument that Officers Cho and Weaver were not acting within the scope of employment because they are alleged to have violated the Constitution. That argument is waived, as it was made for the first time at the hearing. In any event, Plaintiff cites no authority for that proposition, which conflicts with California law generally treating allegedly tortious, unconstitutional, or unauthorized activity that occurs while on the job as being within the scope of one's employment. *See, e.g.*, CACI Nos. 3720, 3721, 3722.

### E.   State Law Claims

#### 1.   Negligence

Plaintiff has produced sufficient evidence for a reasonable jury to conclude that both Officers Cho and Weaver were negligent.  Under California law, peace officers have a duty to use deadly force in a reasonable manner.  *Munoz v. Olin*, 24 Cal.3d 629, 634 (1979).  Courts analyze the reasonableness of the officer's conduct using the totality of the circumstances and from the perspective of a reasonable officer on the scene.  *Hayes v. County of San Diego*, 57 Cal. 4th 622, 632 (2013).  "Law enforcement personnel's tactical conduct and decisions preceding the use of deadly force are relevant considerations under California law in determining whether the use of deadly force gives rise to negligence liability."  *Id.* at 639.

Here, a jury could find that Officer Cho and Officer Weaver's failure to establish a perimeter, wait for backup, and communicate the opportunity to surrender from outside the house was unreasonable and proximately caused Gold's injuries.  Drawing inferences in Plaintiff's favor, Officers Cho and Weaver likely believed the suspect had run into the home, as witnesses reported that Gold ran toward the home and the officers offered to help clear the home. (MSJ Ex. A at 53, 56, 59–60; Opp. Ex. 25.)  At the same time, both officers admitted that there was no emergency necessitating an immediate clearing of the home, and that neither of them had ever cleared a house before.  (Opp. Ex. 1 at 52, 55; Opp. Ex. 2 at 135.)  In these types of non-emergency situations involving a suspect hiding in a home, Plaintiff's expert Sergeant Friedman[7] avers that establishing a perimeter, waiting for backup, and communicating the opportunity to surrender from outside is standard protocol that helps to reduce the likelihood of a deadly confrontation.  Friedman explains that setting a perimeter is an "essential tactical step" that is "the responsibility of the primary officer," as it helps to contain the suspect and buys time for the

---

[7] Defendants' evidentiary objections to Sergeant Friedman's expert report are overruled. Plaintiff has amended the Friedman report to include a signed declaration.  (Dkt. No. 59.) Moreover, it is proper for experts to opine on what an officer *should* have known at the time— what they cannot do is assume the officer knew what is known now, *i.e.*, use hindsight.  Lastly, to the extent Friedman improperly concludes that the officers' force was "excessive" or "unreasonable," the Court does not rely on such conclusions to determine that the question of negligence should go to the jury.

arrival of back-up units.  (Opp. Ex. 23 at 30.)  Moreover, officers often use K-9 units in these type of situations "to locate and apprehend a suspect without officers having to be the first contact" and reduce the possibility that an officer will be surprised and/or respond with deadly force.  (*Id.* at 31.)  Indeed, Friedman points out that CHP policies regard entry to a home in which a suspect is hiding is an "inherently dangerous" situation regardless of whether that suspect is known to be armed.  (*Id.* at 266.)  Thus, a jury could reasonably conclude that Officers Cho and Weaver breached their duty of care by entering the home without waiting for backup.

The Court disagrees with Defendants' contention that Officers Cho and Weaver's search tactics had no effect on the progression of the incident and Gold's subsequent injuries.  Based on the above, a reasonable jury could find that Gold may have surrendered without being mistaken as a threat if, instead of being confronted suddenly in the bathroom, he was instructed by officers to exit the house with his arms above his head.  Moreover, had there been more officers and/or K-9 units on the scene, Officers Cho and Weaver, both of whom have no experience clearing homes, may not have needed to conduct the investigation themselves.

### 2.    Negligent supervision

*Direct liability.*  Defendants are entitled to summary judgment on this issue.  In order to prevail on a direct tort liability theory against a governmental agency, the injured party must identify a specific statute declaring the entity to be liable or creating some specific duty of care by the agency in favor of the injured party.  Cal. Gov. Code § 815; *deVillers v. County of San Diego*, 156 Cal. App. 4th 238, 247–48.  Plaintiff identifies no on-point statute holding a public entity defendant directly liable for negligent supervision, training, or hiring.  While Plaintiff points to regulations that establish qualifications for employment and continuing training requirements for officers, there is no indication that the regulations define CHP's duty of care or establish a right of action for injured parties.  *See* Cal. Gov. Code § 1031; Cal. Code Regs., tit. 11, § 1005(d)(1).

*Vicarious liability based on negligent failure to supervise.*  Defendants are not entitled to summary judgment on Plaintiff's vicarious liability claim.  California Government Code Section

815.2 states: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment[.]"  Here, there is a genuine question of material fact as to whether Officer Marie Stratchan (the officer in charge on the day of the incident) and Sergeant Chris Pia (with whom Officer Weaver interacted directly prior to entering the home) negligently failed to properly supervise Officers Weaver and Cho.[8]  There is evidence that Sergeant Pia assigned Officer Stratchan to be the officer in charge knowing that she would be patrolling on Highway 1 near Big Sur where radio and phone reception is spotty. (Opp. Ex. 25.)  Plaintiff asserts that Officers Weaver and Cho were therefore unable to reach Stratchan to receive instruction on how to proceed.  (Opp. Ex. 1a at 1240.)  While Officer Weaver did call Sergeant Pia for advice, there is evidence that Sergeant Pia did not call Officer Weaver back after Officer Weaver broke off the phone call or inform others in the police department about the ongoing incident.  (Opp. Ex. 25.)  Plaintiff also presents sufficient evidence that this lack of supervision was the proximate cause of Gold's injuries, given Officer Weaver and Officer Cho's lack of experience with clearing a house and expert evidence that a reasonable officer would have taken additional precautions that would have allowed Gold to surrender in a more orderly manner.

### 3.    Assault and battery

Defendants are entitled to summary judgment on this issue as to Officer Weaver, but not Officer Cho.  An assault is a demonstration of an unlawful intent by one person to inflict immediate injury on the person of another then present.  *Plotnik v. Meihaus* 208 Cal. App. 4th 1590, 1603–04 (2012).  A battery cause of action, similar to the federal excessive force claim, requires proof of unreasonable force.  *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527 (2011). An officer's use of force is reasonable if the officer "has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."  *Id.*

---

[8] Defendants suggest that that Officer Stratchan and Sergeant Pia need to be named as defendants in order for vicarious liability to attach.  But Defendants cite no authority requiring such a departure from the vicarious liability rule set forth in Section 815.2, and appear to have abandoned that argument in their reply brief.

at 528.  As explained above, drawing all inferences and resolving all conflicts in Plaintiff's favor, a reasonable jury could find that Officer Cho's decision to use deadly force was unreasonable, while the undisputed facts establish that Officer Weaver's actions were reasonable given the circumstances.

### 4.     Bane Act

Defendant's motion for summary judgment as to Plaintiff's Bane Act claims are denied as to Officer Cho and granted as to Officer Weaver.  The Bane Act creates liability for persons who interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of California.  Cal. Civ. Code § 52.1(a).  A plaintiff must show "specific intent to violate the [individual's] right to freedom from unreasonable seizure."  *Reese v. Cty. of Sacramento*, 888  F.3d 1030, 1043 (9th Cir. 2018).  However, "a reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of those rights."  *Id.*; *see also United States v. Reese*, 2 F.3d 870, 885 (9th Cir. 1993) ("[T]he requisite specific intent is the intent to use more force than is necessary under the circumstances").

If the jury credited Gold's account over Officer Cho's, the jury could reasonably find that Officer Cho recklessly disregarded Gold's rights when she decided to open fire after Gold tossed away his gun instead of using other methods to bring Gold out of the bathroom.  Moreover, Cho intended to use that force, which a jury could find was more than necessary under the circumstances.  However, because the undisputed facts establish that Officer Weaver's actions were not unreasonable, as described above, let alone reckless, Officer Weaver is entitled to summary judgment on this issue.

### 5.     Intentional infliction of emotional distress

Intentional infliction of emotional distress requires "extreme and outrageous conduct." *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965 (1993).  As detailed above, there is a genuine dispute of material fact as to whether Officer Cho used excessive force.  For the same

reasons, drawing all inferences and resolving all conflicts in Plaintiff's favor, a reasonable jury could conclude that Officer Cho shot Gold after he had tossed away the gun in a non-threatening manner and that this use of deadly force constituted "extreme and outrageous" conduct. *See Barker v. Fox & Associates*, 240 Cal. App. 4th 333, 356 (2015) (whether conduct is outrageous is "usually" a question of fact for the jury). However, because the undisputed facts establish that Officer Weaver's actions are not unreasonable, as described above, Officer Weaver is entitled to summary judgment on this issue.

## IV.    CONCLUSION

In sum, Defendants' motion for summary judgment is **DENIED** as to Plaintiff's excessive force, assault and battery, Bane Act, and intentional infliction of emotional distress claims against Officer Cho, and **GRANTED** as to those claims against Officer Weaver. Defendants' motion for summary judgment is further **DENIED** as to Plaintiff's survival action for negligence and negligent supervision against all Defendants, and **GRANTED** as to the Fourteenth Amendment and wrongful death claims against all Defendants.

**IT IS SO ORDERED.**

Dated:  January 27, 2025

_____
RITA F. LIN
United States District Judge